FILED
05/07/2024
Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
January 9, 2024 Session

## STATE OF TENNESSEE v. ASHLEY BIANCA RUTH KROESE

**Appeal from the Circuit Court for Williamson County**
**No. M-CR2000516       James G. Martin, III, Judge**

———————————————

**No. M2022-01180-CCA-R3-CD**

———————————————

A Williamson County jury convicted Defendant, Ashley Bianca Ruth Kroese, of vehicular homicide by intoxication, vehicular homicide with a blood alcohol concentration of 0.08% or greater, vehicular homicide by recklessness, and reckless aggravated assault resulting in death for which she received an effective eight-year sentence. Defendant appeals, contending that the search warrant failed to establish probable cause of intoxication; the search was executed beyond the scope of the warrant; the State failed to demonstrate an unbroken chain of custody of the blood samples; and the trial court erred when it did not sentence her as an especially mitigated offender. Following our review of the record, the briefs, and oral arguments of the parties, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

JILL BARTEE AYERS, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and TIMOTHY L. EASTER, JJ., joined.

Ann C. Short, Knoxville, Tennessee (on appeal); Lee Ofman, Franklin, Tennessee, and Joshua Brand, Nashville, Tennessee (at trial) for the appellant, Ashley Bianca Ruth Kroese.

Jonathan Skrmetti, Attorney General and Reporter; Lacy E. Wilber, Senior Assistant Attorney General; Stacey Edmonson, District Attorney General; and Carlin C. Hess, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Facts and Procedural History

The Williamson County Grand Jury entered a true bill charging Defendant with vehicular homicide by intoxication (count one), vehicular homicide with a blood alcohol content ("BAC") of 0.08% or greater (count two), vehicular homicide by recklessness

(count three), reckless aggravated assault resulting in death (count four), reckless endangerment with a deadly weapon (count five), and failure to drive on the right of the roadway (count six). Counts five and six were later dismissed.

This case arose from a two-car head-on collision on June 18, 2020, at 4:56 a.m. in front of the Brentwood Market and Deli in Williamson County that resulted in the death of Brentwood Police Department ("BPD") Officer Dustin Leguiza as he was nearing the end of his shift. Defendant was the driver and sole occupant of the other vehicle, a black Jeep. Although Defendant is not challenging the sufficiency of her convictions, we will briefly summarize the trial proof underlying them.

An investigation of Defendant's whereabouts leading to the crash showed that from the time she parked her car in Downtown Franklin at 7:33 p.m. on June 17, 2020, to when she was seen driving away at 4:30 a.m. on June 18, 2020, Defendant consumed alcohol at three different establishments. Patrons and employees who saw, served, or conversed with Defendant testified that Defendant had one nine-ounce glass of wine, a six-ounce glass of wine, fries, and ice cream at Americana Taphouse; a six-ounce glass of wine, a mixed whiskey drink, and no food at O'Be Joyful; and a mixed drink, a light Corona beer, water, and some chips at Kimbro's.

Four people who saw Defendant at one or all of the three establishments testified that Defendant did not appear to be intoxicated. The EMT who transported Defendant to the emergency department and two of the officers who were at the crash site to offer assistance and secure the site also testified that they did not smell alcohol on Defendant before she was removed from her car. However, Jessica Hoertner-Simons, a bartender at the last bar Defendant patronized, testified that she was concerned about Defendant's sobriety and offered to get Defendant a cab or an Uber to take her home. Because she was concerned about Defendant's sobriety, Ms. Hoertner-Simmons stayed until closing. Ms. Hoertner-Simons testified that she discussed her concern about Defendant with Max Jordan, another bartender who was not working that evening but who was there and was seen on one of the traffic cameras walking Defendant to her car after the bar had closed. Jennifer Pramuk, a second bartender working with Ms. Hoertner-Simons, testified that she talked to Mr. Jordan about getting Defendant an Uber. Mr. Jordan denied however, having either discussion with Ms. Hoertner-Simons or Ms. Pramuk.

Traffic cameras along Defendant's path of travel from downtown Franklin to the Brentwood Market and data collected from Defendant's car showed that Defendant was driving without her headlights on and in the wrong lane of traffic for at least 0.3 mile before crashing into the victim's patrol vehicle. Defendant was driving north in the southbound lane while the victim was driving south in the southbound lane of Franklin Road. A civilian who came upon the crash after it had occurred and dialed 911 described this part of the

- 2 -

street as "dark," and confirmed that it would have been obvious to Defendant if her vehicle headlights were not activated.

The first paramedic to arrive at the crash immediately tended to the victim because he was unresponsive and in less stable condition than Defendant who was conscious and speaking. The victim was crushed between the front of his patrol car and the cage in the back of the vehicle. He was found slumped over the steering wheel and his lower extremities were pinned underneath the dashboard of the vehicle. The victim was extricated from his patrol car by the fire department at 5:16 a.m., and the paramedics left the crash site at 5:23 a.m. All life saving measures were unsuccessful, and the victim was pronounced dead at 5:45 a.m.

The forensic pathologist who performed the victim's autopsy concluded that the thirty-year-old victim's cause of death was multiple blunt-force injuries resulting from the head-on collision. The blunt-force injuries manifested in abrasions, contusions, and lacerations on the skin; multiple fractures to the lower left leg; hemorrhage of the left front region of the head; rib fractures; collection of blood in the chest cavity and back abdominal cavity; lacerated spleen; contusions to the lungs and testes; hemorrhage of the airways; pelvic fractures; and a perforated bladder.

Defendant was also extricated from her vehicle and taken to the emergency department at Vanderbilt University Medical Center ("VUMC") in Davidson County. As discussed more fully below, Defendant's blood was drawn and tested in the regular course of treatment. Four tubes of Defendant's blood were later collected from the hospital by an officer pursuant to a search warrant. The officer hand-delivered the tubes to the Tennessee Bureau of Investigation ("TBI") where it was tested by a forensic scientist who testified that Defendant's blood alcohol concentration ("BAC") was 0.166%, twice the legal limit. *See* T.C.A § 55-10-401(2).

Prior to trial, Defendant filed a motion to suppress the BAC result of her blood samples alleging that the facts alleged in the search warrant affidavit did not show that she was intoxicated at the time of the crash and thus the warrant lacked probable cause. Defendant also claimed the officer who executed the search warrant exceeded the scope of the warrant by serving the warrant on the hospital where her blood was drawn as a trauma patient and in preparation for surgery, and not on her directly.[1] Defendant also filed a motion in limine challenging the chain of custody of her blood samples. Because the issues before us involve facts presented in the affidavit and evidence introduced at separate hearings, we will separately summarize the facts related to each of Defendant's issues.

---

[1] Defendant also claimed the affidavit contained false information. She has dropped this claim on appeal.

The trial court held two pretrial hearings on the motion to suppress and the motion in limine. At the first hearing, the trial court addressed only the suppression issue on the lack of probable cause. The trial court confined its ruling to the affidavit, the warrant, and the arguments of the parties. Defendant argued that "an accident alone in Tennessee is not enough to provide probable cause for a blood draw." Defendant further argued that the affidavit in support of the warrant contained "no indicia of intoxication" such as the odor of alcohol, slurred speech, or unsteadiness on one's feet and that driving in the wrong lane of traffic rises only to reasonable suspicion to conduct a traffic stop, not probable cause to support a warrant for a blood draw. The crux of the State's argument was that "erratic driving in and of itself is an indicator of impairment" which "can support probable cause by a detached and neutral magistrate that the suspect was impaired."

Matthew Priest, a Tennessee Highway Patrol ("THP") trooper, applied for the warrant to draw Defendant's blood. According to the affidavit, Trooper Priest swore under oath before a magistrate that Defendant was involved in a traffic crash with injury to another party and requested that Defendant's blood be drawn to obtain evidence of "any intoxicant, marijuana, controlled substance, drug, substance affecting the central nervous system or combination thereof that impair[ed]" Defendant's ability "to safely operate a motor vehicle by depriving . . . her of the clearness of mind and control of . . . herself" which would serve as evidence of vehicular homicide, vehicular assault and driving under the influence ("DUI") involving "a traffic crash with injury to another party." The affidavit and warrant both identified Defendant by her full name, race, gender, and date of birth. The statement of facts in support of probable cause included the following:

> On 06/18/2020 at approximately 0456 hours a multiple vehicle crash occurred on 925 Franklin Rd. In Brentwood, TN. Your Affiant learned that the Defendant drove on the opposite lane of travel for more than one mile observed by traffic camera[s] prior to this crash at the intersection of Franklin Rd and Concord Rd. without head [lights][2] activated in a black Jeep. The Defendant made head on contact with a Brentwood Police Office Unit causing serious bodily injuries and later died of his injuries. Both parties involved in the crash were transported to Vanderbilt ER. At approximately 0708, I was dispatched to make contact with the Defendant. Upon my arrival at the hospital the Defendant was heavily medicated and about to go into surgery. The Defendant was not in a stable state to give consent for a blood

---

[2] The word "lights" is handwritten above the word "activated."

draw or state the events prior to the crash. This incident occurred in Williamson County and transported to Davidson County for treatment.

Below the statement of facts, Trooper Priest provided his experience and his training in DUI investigations:

> Your Affiant is currently certified as a State Trooper in the State Of Tennessee with the Tennessee Highway Patrol and has been certified since 2013. Your affiant received training in DUI investigation during the academy and ARIDE.[3]

Based on Trooper Priest's affidavit, the magistrate found probable cause of "certain evidence" of vehicular homicide, vehicular assault, and DUI, and authorized an immediate search of Defendant, to "seize blood and to further examine said blood for evidence of impairment including but not limited to alcohol and/or drugs as determined through a forensic toxicological examination; requesting all unredacted medical records prior to treatment and during treatment."

At the conclusion of the first hearing, the trial court noted that a blood draw conducted pursuant to a warrant is presumptively reasonable and that the court was to give "great deference" to the magistrate's determination in issuing the warrant. Based on the totality of the circumstances and the experience and training of Trooper Priest, the trial court found that the crash was "not a mere accident" and had "unique features" to support probable cause of "impairment while driving." The trial court denied the motion to suppress the BAC.

*Suppression Hearing – November 29, 2021 – Scope of Warrant*[4]

At the second hearing, Trooper Priest testified that in his career, he had served "more than [twenty]" warrants on VUMC to obtain blood. On June 18, 2020, Trooper Priest was directed to VUMC to determine whether Defendant could consent to a blood test and discuss the crash. However, he first went to the District Attorney's Office in Nashville for guidance on whether to apply for the search warrant in Williamson County, where the crash occurred, or in Davidson County, where Defendant was hospitalized. Although it was determined that the warrant was to be issued in Davidson County, Trooper Priest went to VUMC in an attempt to first obtain Defendant's consent to draw her blood. He saw and

---

[3] At the pretrial hearing, the trial court noted that ARIDE was "a special DUI investigation program that [is] offered to law enforcement."

[4] Other witnesses testified at this hearing on issues not raised on appeal; thus, we have not included summaries of those witnesses' testimonies.

spoke with Defendant who was being prepped for surgery and had already been administered pain medication. Trooper Priest testified that Defendant could state her name but she could not remember the crash and she was "in and out" during their conversation. Because Trooper Priest determined that Defendant lacked the physical and mental capacity to give consent to a blood draw, he left the hospital and went to the magistrate in Davidson County to apply for a warrant for Defendant's blood.

To prepare the affidavit, Trooper Priest spoke to three officers who observed the crash site in person: Trooper Daniel Nieuwenhuis, Trooper Gerald Buchanan, and Sergeant Ernest Young. Trooper Priest spoke to them by radio, phone, and dispatch several times to complete the warrant application. The three troopers conveyed to Trooper Priest what they had observed in person and what they had seen on traffic camera footage. Trooper Priest used a Davidson County template to complete the application for the warrant.

Trooper Priest testified that based on his prior experience serving search warrants for blood, it was "common knowledge" that a patient's blood is drawn upon arrival in the emergency department and when being prepped for surgery. In this case, he presumed that Defendant's blood had already been drawn because she was being prepped for surgery. He testified that he was personally aware of this practice because his blood had been drawn before he had undergone surgery. Based on his knowledge and experience, Trooper Priest testified that he understood the search warrant would be served on VUMC. The application for the warrant did not include "pre-existing blood" because that was covered under the request for "all blood."

Trooper Priest returned to VUMC and served the warrant on a hospital lab technician who then forwarded it to VUMC's legal department. He testified that he did not serve the warrant on Defendant because she was in surgery. Once the VUMC legal department reviewed the warrant and approved release of the drawn blood, Trooper Priest was handed four tubes in a clear, sealed biohazard bag which he then handed to Trooper Nieuwenhuis. Trooper Nieuwenhuis then placed the bag containing the four tubes in a TBI blood kit he had brought with him.

*Motion in Limine – Chain of Custody*

Allie Osborne, a registered nurse in VUMC's emergency department, described her responsibilities which included administering medication, drawing blood, and collecting samples. Ms. Osborne testified that she had treated "thousands" of patients and although she could not recall Defendant specifically, she had become familiar with Defendant's care as a trauma patient after reviewing Defendant's medical records. Ms. Osborne confirmed that she was Defendant's primary nurse upon Defendant's arrival to the emergency department around 6:00 a.m. on June 18, 2020.

- 6 -

Ms. Osborne testified that it is customary practice for a patient's blood to be drawn upon arrival in the emergency department to evaluate and understand a patient's blood counts, electrolytes, and clotting factors to determine the course of treatment. Along with the blood draw, every patient who enters the hospital for treatment is given a medical record number ("MRN") which serves as a patient specific identifier; no two people will have the same MRN. If the patient's name is unknown or unavailable at the time of the blood draw, a "stat name" is auto-generated as a means to identify the patient. The patient's name, date of birth, and driver's license number are then later merged into the chart when the information becomes available.

Once blood is drawn, the tubes are placed in a plastic biohazard bag, which is labeled with the patient's name and MRN, and placed at the patient's bedside until lab tests are ordered. Once lab tests are ordered, labels are automatically generated from the patient's medical records and printed to be affixed to the tubes. Each label contains the patient's name, date of birth, MRN, and a barcode specific to that tube of blood for the ordered lab test. In this instance, Ms. Osborne testified she affixed the lab labels on each of the tubes and scanned the barcodes to Defendant's medical records. Typically, she or another staff member walks the samples to the lab for testing. Because she scanned and placed the labels on the tubes of blood collected from Defendant, there was "a very good chance" that she hand-delivered Defendant's blood samples to the lab.

Ms. Osborne testified that VUMC has a main laboratory and a satellite laboratory referred to as the "ED Stat Lab." Both laboratories are locked but have a drop-off box with a door where one can leave samples for testing. She did not personally draw Defendant's blood and did not know who did. And although she could not state how many hospital personnel had access to Defendant's blood, Ms. Osborne testified that the emergency department is always locked and has a secured entrance accessible only with an authorized badge. When Defendant arrived at the emergency department in June 2020, COVID-19 lockdown measures were in place so no visitors were allowed during that time; the only people in the department would have been patients, medical personnel, hospital employees, and EMS crews.

On cross-examination, Ms. Osborne could not recall how many tubes of blood were drawn and collected from Defendant. Each tube collected had a stopper with a particular color to identify which additives were in the tube. The most common colors were lavender, green, red, and light blue. Although it was possible for several employees to have touched the tubes on their way to the lab, Ms. Osborne testified that VUMC does not maintain a record identifying every hospital personnel who handles a patient's blood tubes. However, based on her review of Defendant's medical records and her independent recollection of Defendant's case, she had "no reason to believe" that Defendant's blood samples had been

tampered with in any way. She reiterated that she had no further contact with Defendant's blood samples after they were dropped off at the lab and that she hand-delivered the samples shortly after the labels were scanned at 6:07 a.m.

Elisa Grady, senior program manager in the specimen receiving unit at VUMC, testified that VUMC has a main laboratory known as the diagnostic laboratory and several satellite laboratories within the hospital building. Employees who work within the labs have access to all labs within VUMC. In June 2020, the specimen receiving unit had close to forty employees.

Ms. Grady described the procedure for matching specimen or blood samples to the correct patient. "The habit is to take each one of the specimens or samples and match them up to the accession numbers, patient MRN, and name, to make sure that you have said person, said samples." Ms. Grady testified that there was no reason for her to believe that the same process had not occurred in receiving Defendant's samples. Ms. Grady authenticated four separate screen shots of the testing ordered for Defendant's blood. Based on Defendant's medical records, Ms. Grady had created for trial a summary chart of the ordered tests representing the four tubes of blood with six columns identifying the requested test, each tube's unique identifier or "accession number," the color of the stopper, any additive, the collection date and time, the lab scientist who received the samples, the lab that received the samples, the time the samples were tested, and when the results were published.

In reviewing the summary chart she had prepared, Ms. Grady testified that the specimen identification numbers listed in Defendant's medical records matched the accession numbers. Lab tests for the four tubes of Defendant's blood were ordered at 6:07 a.m. and each of the samples had undergone testing within the VUMC lab before being released to law enforcement. Ms. Grady had experience with law enforcement serving warrants on VUMC to obtain blood samples for criminal investigations. When the receiving unit is served with a search warrant, the warrant is forwarded to VUMC's legal department for approval; a decision on the warrant takes "roughly" an hour, and the legal department always informs the receiving department of its decision. Once the legal department approves release of blood samples to law enforcement, a staff member in the receiving unit or a VUMC laboratory employee retrieves the samples for release. Ms. Grady was unaware of any document that would identify the staff member or lab employee who retrieved Defendant's samples for release and could not recall who retrieved the samples in this case and delivered them to her for release.

Ms. Grady testified that when a specimen has been approved for release, the samples are packaged in a specimen bag or placed in a TBI kit as provided by law enforcement. A specimen bag is a clear, plastic bag that zips up like a Zip-lock bag and has a biohazard

symbol on one side. While she could not recall how the samples were packaged in this case, she testified that four tubes of Defendant's blood were released to Trooper Nieuwenhuis at 2:45 p.m. on June 18, 2020, as shown on the specimen release form. Based on her signature on this form, Ms. Grady was confident that she was the person who handed the specimen bag to Trooper Nieuwenhuis who was accompanied by Trooper Priest whose name was also included on the signature line as a receiving party. Ms. Grady affirmed that the blood in the four tubes were all tested at VUMC before they were released to Trooper Nieuwenhuis. She had no reason to believe that the four tubes were in any way altered or tampered with while they were in the custody of VUMC.

THP Trooper Daniel Ryan Nieuwenhuis testified that he went to VUMC with Trooper Priest to execute the search warrant for Defendant's blood samples. Trooper Nieuwenhuis recalled that it took about an hour from the time the warrant was served to when he and Trooper Priest took custody of the blood samples. When the hospital legal affairs department approved the blood samples for release, both officers signed the specimen release form and included their badge numbers. Trooper Nieuwenhuis was standing next to Trooper Priest when the lab technician handed Trooper Priest the clear plastic bag sealed shut and containing four tubes. Trooper Priest then immediately handed the bag to Trooper Nieuwenhuis.

Trooper Nieuwenhuis testified that Trooper Priest did not unseal the bag, remove the tubes from the biohazard bag, or otherwise tamper with the tubes before handing him the biohazard bag. Trooper Nieuwenhuis put the biohazard bag and the specimen release form in a TBI issued blood kit. He testified that a TBI kit comes with a toxicology request form, a plastic bag, and two tubes with gray colored stoppers. He explained that he carries a TBI blood kit in his patrol car for DUI investigations. Typically, when he executes a warrant for a blood draw, he watches the blood being drawn and collected in the tubes with the gray stoppers. In this instance, because the blood had already been drawn before the warrant was issued, Trooper Nieuwenhuis did not witness the blood being drawn, and the tubes in the TBI kit were not used to collect Defendant's blood. Trooper Nieuwenhuis disposed of the empty tubes in the TBI kit before placing the biohazard bag with the four tubes in the kit along with a completed toxicology request form requesting alcohol and drug testing. He testified that he keeps a toxicology request form on hand in the normal course of business. He retained a copy of the specimen release form for his records. He confirmed that the biohazard bag remained sealed while he placed it in the TBI kit at VUMC.

Trooper Nieuwenhuis and Trooper Priest left the hospital and drove separately to the Davidson County Courthouse to return the warrant. Trooper Nieuwenhuis placed the TBI kit in the passenger seat of his patrol car in a milk crate he used to keep his folders and citations. The kit remained in the milk crate the entire drive to the courthouse which took

approximately twenty-five minutes, and remained locked inside for approximately thirty minutes while he returned the warrant.

The kit remained in the same crate as Trooper Nieuwenhuis drove thirty minutes from the courthouse to TBI headquarters to hand-deliver the kit. This was the first time he hand-delivered a kit. He was met by Leesa Gant at the TBI who was expecting him. Once he handed the kit to Ms. Gant, she opened it in his presence, confirmed that there were four tubes in the kit, and checked to ensure the toxicology request form had been completely filled out. She took down his phone number because he forgot to write it down on the toxicology request form. Trooper Nieuwenhuis testified that from the moment the bag of tubes was delivered to him and Trooper Priest at VUMC to the moment he delivered the kit to Ms. Gant at the TBI, the bag remained in his custody. During that time, no one unsealed the bag or otherwise tampered with the tubes while they were in his custody. After he relinquished control of the kit, Trooper Nieuwenhuis never handled the blood evidence again.

Leesa Gant, a TBI forensic technician, testified that she had been advised that Trooper Nieuwenhuis would be hand-delivering blood samples to the TBI. In the usual course of business, upon receipt of evidence, it is either placed in a secure drop box, mailed, or hand-delivered as was done in this case. While it was "not unusual," it was not common for evidence to be hand-delivered. Ms. Gant met Trooper Nieuwenhuis in the lobby where he handed her a sealed TBI blood kit. She viewed the kit briefly and took down Trooper Nieuwenhuis's name and information and the time and date the evidence was received at the TBI. She also opened the kit to verify that the toxicology request form had been properly filled out. She noticed that the trooper had left out his phone number so she added this information to the request form. She then placed the toxicology request form back in the kit, resealed it, and took it to the restricted biohazard room to unseal the bag of tubes and prepare the tubes for deposit in the toxicology vault for testing.

Once in the biohazard room, Ms. Gant opened the kit, unsealed the bag with the tubes, completed the bottom portion of the toxicology request form, photographed the tubes, and entered information about the samples from the request form into the TBI database which generated labels with a unique TBI lab number. The labels were affixed to the tubes and included the lab number, the agency requesting testing, a description of the specimen, and a bar code. Ms. Gant explained that the bar codes are scanned into the TBI database and used to keep track of each specimen while in TBI's custody. The toxicology request form was exhibited to her testimony. She testified that she completed the bottom portion of the form and in her experience, had previously signed 60,000 such forms, or on average, 500 a month. She confirmed that in the normal course of business, she enters the information from the form into the database at the time she completes the bottom portion of the form and confirmed that the form is kept at the TBI.

Ms. Gant testified that there is a system in place of rechecking the tubes and any accompanying paperwork. When she turns over a specimen to the forensic scientist, the scientist then checks to confirm that Ms. Gant correctly entered the information about the specimen in the TBI database. Ms. Gant reviewed the request form in this case and testified that "1-SB" indicated that the specimen or blood samples was contained in a specially designed sealed kit. The form noted that the blood was drawn at 5:56 a.m. and four tubes of blood were received by the TBI at 4:15 p.m. Ms. Gant took the collection information from the labels on the tubes. She identified the TBI lab number assigned to the case and stated that every result, information, or conclusion about a specimen from a scientist or technician bears the same TBI laboratory number.

In this case, Ms. Gant identified three of the tubes as Exhibit 1, and the fourth tube as Exhibit 2. The three tubes grouped together appeared to be blood while the fourth tube had blood on the bottom of the tube with a wax-like or "clearish liquid" in the middle. The tube in Exhibit 2 received a separate and distinct TBI lab number from the three tubes in Exhibit 1.

After entering information about a specimen into the TBI database, Ms. Gant places the tubes on a rack which is then placed inside a bag called "a convenient seal." She then starts the process to transfer the tubes to the toxicology vault:

> Once I have them in my hands, the tubes and my case file, I will pull up the screen on the computer, I will put my name, it reports the date and time. And also will record where I'm taking them. Once I hit apply, I'm physically carrying them outside the unit, short distance to toxicology unit. I have access to scan and get into their door and to scan and get into their vault.

In this case, Ms. Gant placed the tubes into the toxicology vault at 5:11 p.m. She was aware that only the toxicology supervisor and the forensic scientists had access to the vault. Ms. Gant had no further dealings with the tubes after she secured them in the toxicology vault. On cross-examination, Ms. Gant confirmed that the blood samples she received were not contained in a TBI kit. She added that she would note in the request form if there was anything unusual about the evidence.

Special Agent Jaqueya Ogilvie, a forensic scientist in the TBI toxicology unit, testified that she tested the blood samples in this case on June 18, 2020. In the normal course of business, when she begins an analysis, she retrieves the samples that are temporarily stored in the toxicology vault, which she described as "a large chiller." The vault can only be accessed by scanning a barcode which few people in the TBI possess.

She confirmed that she retrieved the blood samples in this case following the same protocol.

On initial examination, she looks at the tubes and checks to make sure the information on the request form matches the information on the tubes. She also looks at the condition of the sample to determine whether it is a good sample for testing. In this case, she verified that the information on the tubes matched the information on the request form by adding her initials to the toxicology request form. Agent Ogilvie also took down some additional notes about the tubes. She affirmed that she had personal knowledge of the information used to complete the case notes in this case and that she makes and retains notes in the regular practice of analyzing samples at the TBI. She testified that in this case, three tubes were identified as Exhibit 1, and one tube was identified as Exhibit 2. She wrote that all four "appear to have been drawn at the same time."

Agent Ogilvie testified that it is common for her to relabel the tubes. Here, she observed that the "P" in "1P4" as designated by Ms. Gant stood for the color "purple." Agent Ogilvie wrote in "lavender" on the request form next to the tube labeled as "IP4" because that was how it was labeled by VUMC. She likewise relabeled the other tubes to be consistent with the VUMC labels. She observed that one of the three tubes in Exhibit 1 was clotted, and the sole tube in Exhibit 2 contained serum or plasma. Agent Ogilvie wrote "BAC" next to the "IP4" lavender tube to note that she used the blood in the lavender tube to perform the BAC test.

She explained further that typically samples arrive in the blood kit the TBI issues to police agencies. The kits contain two ten-millimeter tubes with gray colored stoppers. When she does not receive a gray stopper tube, she uses "the next best sample," which would be the sample in a lavender stopper tube because lavender tubes contain an anticoagulant. She testified that the different colored stoppers reflect the different additives in the tubes. In this case, Agent Ogilvie tested only the blood in the lavender tube. As part of her analysis, she tested the sample twice and took the average alcohol concentration from the two tests. The last sample was analyzed at 9:11 p.m. and returned to the toxicology vault at 11:07 p.m.

Agent Ogilvie testified that the TBI maintains an internal chain of custody log for each exhibit associated with a laboratory case number. The laboratory case number is generated by scanning the bar codes on each tube. In this case, an internal chain of custody report was generated for the blood samples and summarized the chain of custody of the samples while in the custody of the TBI. The report showed that Trooper Nieuwenhuis relinquished the samples to Ms. Gant at 4:15 p.m., Ms. Gant secured the samples in the toxicology vault at 5:11 p.m., Agent Ogilvie retrieved the samples from the vault at 6:23

p.m., and Agent Ogilvie returned the samples to the toxicology vault at 11:07 p.m.[5]  She was confident that the samples were neither tampered with nor contaminated while in TBI custody.  At the time of the hearing, the samples were still in the custody of the TBI.

*Trial Court Rulings*

Following the second hearing, the trial court entered two separate written orders addressing the motion to suppress and the motion in limine.  In denying the motion to suppress the BAC based on the claim that the search exceeded the scope of the warrant, the trial court considered the evidence and the testimony of Trooper Priest and Ms. Osborne, found both witnesses to be credible, and rejected Defendant's argument that Trooper Priest exceeded the scope of the warrant by serving it on the lab technician in the hospital rather than on Defendant.  The trial court held that the search warrant was specific as to what evidence was to be seized ("evidence of vehicular homicide and vehicular assault") and where such evidence would be located ("in the . . . blood of [Defendant]").  The warrant allowed for the seizure of "ANY blood from [Defendant]."  The trial court held that the use of the word "any" in describing the evidence to be seized encompassed not only the blood in Defendant's body, but also any existing blood samples.

In denying Defendant's motion in limine, the trial court held that the State had established the identity and integrity of Defendant's blood samples through a sufficient chain of custody.  The trial court accredited the testimonies of all the witnesses and recounted each of their testimonies in its findings of fact.  The trial court found "no evidence of tampering, loss, substitution, mistake, or any other irregularities concerning [Defendant]'s blood samples.  None of the witnesses had any reason to believe the blood samples were tampered with or altered in any way."  The trial court also found that the blood tested by Agent Ogilvie was what it purported to be, Defendant's blood.  The proof established that there was "only one Ashley Bianca Ruth Kroese at [VUMC] at the time [Defendant] was being treated for the injuries she sustained in the crash" and the colors of the stoppers as documented in Agent Ogilvie's case notes matched the colors described on the release form supplied by VUMC.

*Trial*

Ms. Osborne, Ms. Grady, Trooper Nieuwenhuis, Ms. Gant, and Special Agent Ogilvie also testified at trial.  Their testimonies concerning the collection of Defendant's

---

[5] The internal chain of custody report showed that the tube was tested for drugs by Special Agent Joe Castelbuono the next day.  The parties stipulated that the proper chain of custody was maintained by Agent Castelbuono.  The presence of drugs was not an issue in this case because no drugs were found.  For this appeal, Agent Ogilvie was the last link in the chain of custody.

blood at VUMC and the testing of it at the TBI were consistent with their testimonies at the pretrial hearings on the motion to suppress and the motion in limine.

In addition to her testimony about testing Defendant's blood sample, Agent Ogilvie was asked to describe the effect of alcohol on the body and testified that alcohol is an "essential nervous system depressant" meaning that it "slows down" the brain's activity. Although driving is commonly thought of as a "singular" activity, Agent Ogilvie explained that when one drives, one is performing "a lot of individual tasks at the same time that require attention" such as slowing down, speeding up, steering, and maintaining the lane of travel, and alcohol "impairs the brain's ability to devote enough attention to each . . . task." She added that alcohol also impairs a person's critical judgment, decision-making ability, and reaction time.

Agent Ogilvie was also asked to explain how many drinks a person would have to consume to reach a BAC of 0.166%:

> [A] standard drink is one to one and a half ounces of hard liquor; or four to six ounces of wine; or about [twelve] ounces of beer. And so an individual that had a 0.16 blood alcohol concentration, if they were 150 pounds consuming all those drinks, in about 15 minutes on an empty stomach, it would take them somewhere around seven to nine drinks to get to that 0.16 alcohol concentration.

She explained further that if a person drinks over a longer period of time, the person would have to consume more drinks as the body "is actively eliminating alcohol as soon as we begin consuming it[.]" She stated that it would take less alcohol to exceed the legal limit in a person who weighs less, such as a person who weighs 125 pounds.

Agent Ogilvie testified that the body eliminates about one drink an hour, or approximately 0.01 or 0.02%, but that elimination can be slowed down by the consumption of food. She testified further that while a person's BAC may "peak" approximately thirty to sixty minutes after one stops drinking, the body continues to eliminate alcohol "as soon as one begins consuming it[.]" Speaking "kind of generically" in response to a hypothetical scenario of a woman weighing 135 pounds, standing five feet, seven inches tall, who drank two "standard drinks" over a two hour period, Agent Ogilvie estimated that the body would have eliminated the alcohol and the BAC "would probably be zero[.]" Agent Ogilvie testified that she did not know whether the facts that served as the basis for the hypothetical were true in this case; she had no personal knowledge of Defendant's drinking behavior on the night of the crash, and remained "very confident" that the blood in this case tested 0.166% ethyl alcohol.

- 14 -

Trooper Gerald Buchanan, a member of the Critical Incident Response Team of the THP, testified without objection as an expert in crash reconstruction. In reconstructing the crash, Trooper Buchanan observed and photographed the crash site, examined both vehicles and the crash data analysis. He testified that both vehicles had extensive front-end damage to the driver side. He explained that when headlights are on, the filaments in the bulb stretch and heat up. In this case, the filaments in the front headlights of Defendant's vehicle were not stretched, indicating that they were not activated at the time of the crash. Trooper Buchanan confirmed that he had reconstructed crashes where alcohol was a contributing factor and, in this case, he had received information about Defendant's BAC. When asked by the State for his opinion on the cause of the crash based on his investigation, experience and training, Defendant objected to Trooper Buchanan's giving an opinion that included intoxication as a cause of the crash. The trial court agreed and instructed Trooper Buchanan that he was "to rely solely upon the driving behavior of the Defendant" because the only information Trooper Buchanan had about Defendant's intoxication was the BAC which did not arise from his investigation of the crash. Accordingly, Trooper Buchanan testified that the crash was caused by Defendant driving in the wrong lane without headlights.

*Sentencing*

Defendant's presentence report was admitted without objection after two corrections regarding Defendant's education. Timothy Finney, a BPD officer who worked alongside the victim during the night to morning shift, read a written statement into the record. Scott Legieza, the victim's father, also read from a written statement. Julie Ray, the victim's mother, and Heather Legieza, the victim's widow, each testified describing the victim, his legacy, and the impact of his death. A slideshow presentation was also exhibited. Following the testimony of the victim's widow, the State closed its proof.

Defendant introduced ninety letters in her support, her driving record, documentation that no claims had been made against Defendant's insurance in the last five years of her contract, a verified criminal record check from the Ministry of Justice in France indicating the absence of a criminal record, and her educational records from high school to university and business school. Two videos, one in support of Defendant, and a slideshow prepared by Defendant were played at sentencing. Michelle Peterson, Defendant's aunt, testified in support of Defendant and Defendant made an allocution expressing her remorse.

The State acknowledged that there were no applicable enhancement factors but argued that an eight-year-sentence would not "promote justice" due to the seriousness of the offense. The State noted that Defendant's decision to drive with a BAC of more than twice the legal limit showed a disregard for the safety of others. The State advised that the

average sentence for a Standard Offender convicted of a Class B felony was nine years, four months according to the previous year's statistics from the Administrative Office of the Courts and advocated that a ten-year sentence with a ten-year revocation of Defendant's driver's license would be consistent with the principles of sentencing set forth in Tennessee Code Annotated section 40-35-102 and 40-35-103.

Defendant argued that mitigating factor (13), "[a]ny other factor consistent with the purposes of this chapter," was applicable based on Defendant's lack of criminal history, her age, the support of her family and friends, her character, and her standing in the community, *see* T.C.A. § 40-35-113(13), and argued for the minimum eight-year sentence. Defendant stated twice that but for the seriousness of the offense, Defendant would be a "prime candidate" for sentencing as an especially mitigated offender.

The trial court stated that it was "inclined to apply" the especially mitigated defender classification to Defendant. In response, the State argued that sentencing Defendant as an especially mitigated offender would "send the wrong message to the [victim's] family, the community, and other[s] similarly situated to [Defendant]." The State distinguished a "mitigating offense" from an especially mitigated offender and maintained its position that in light of the facts and circumstances of the offense, "it would be inappropriate" to sentence Defendant as an especially mitigated offender.

The trial court examined the purposes and principles of sentencing in detail and noted that since January 1, 2017, a vehicular homicide conviction is no longer eligible for probation. The court did not find helpful the statistics about sentences for Standard Offenders convicted of Class B felonies because Class B felonies "encompass[es] so many different kinds of criminal misconduct." Because Defendant lacked a criminal history, the trial court found the following principles did not apply: confinement is necessary to protect society from a defendant with a long history of criminal conduct and measures less restrictive than confinement had been frequently and unsuccessfully applied. *See* T.C.A. § 40-35-103(1)(A), (C). The trial court instead focused on imposing a sentence that was "the least severe measure necessary." *Id.* § 40-35-103(4).

The trial court considered the evidence at trial and sentencing and the presentence report which revealed no criminal history, "not even a traffic ticket" and therefore made Defendant a "strong candidate for rehabilitation." The presentence report also revealed that Defendant's risk of reoffending was low and that she was assessed with moderate needs in the category of family aggression and alcohol and drug use. The trial court reviewed Defendant's education, professional experience, family history, and health history including no use of illegal drugs or use of prescription drugs in an illegal manner. Defendant had acknowledged mental health issues in connection to her incarceration for the instant case.

The trial court considered the evidence in support of mitigating factor (13) and found Defendant's expression of remorse to be "genuine." The trial court indicated it could not "diminish the horrific conduct that was involved here," noting the grave circumstances of the offense and its tragic consequence on the victim's family and the City of Brentwood in losing one of its police officers. The trial court declined to sentence Defendant as an especially mitigated offender because "under the facts or circumstances of this case, it would be sending the wrong message to the community." The trial court instead sentenced Defendant in count one to an eight-year sentence as a standard offender with a five-year suspension of her license. Because Defendant's other convictions represented alternative theories involving the same victim and the same evidence, the three lesser convictions merged into the most serious conviction, vehicular homicide by intoxication, a Class B felony. Defendant filed a timely motion for new trial which was denied. This timely appeal followed.

**Analysis**

I.      *Motion to Suppress Defendant's BAC Result – Probable Cause*

Defendant contends the trial court abused its discretion in denying her motion to suppress the BAC result of her blood sample because the search warrant affidavit failed to establish probable cause. The State argues that the affidavit provided probable cause to support a warrant for a blood draw. We agree with the State.

We review a trial court's ruling on a motion to suppress by affording the prevailing party the "strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." *State v. Carter*, 16 S.W.3d 762, 765 (Tenn. 2000); *State v. Martin*, 505 S.W.3d 492, 500 (Tenn. 2016); *State v. Henry*, 539 S.W.3d 223, 232 (Tenn. Crim. App. 2017). The trial court's findings of fact in a suppression hearing are upheld unless the evidence preponderates against them. *Martin*, 505 S.W.3d at 500; *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998); *Henry*, 539 S.W.3d at 232. The application of the law to the facts found by the trial court is a question of law and is reviewed de novo on appeal. *State v. Clayton*, 535 S.W.3d 829, 846 (Tenn. 2017); *State v. Willis*, 496 S.W.3d 653, 686 (Tenn. 2016); *State v. Climer*, 400 S.W.3d 537, 556 (Tenn. 2013). "Further, appellate courts, when evaluating the correctness of the ruling by the trial court on a motion to suppress, may consider the entire record, including not only the proof offered at the hearing, but also the evidence adduced at trial." *State v. Williamson*, 368 S.W.3d 468, 473 (Tenn. 2012).

The Fourth Amendment of the United States Constitution and Article I, Section 7 of the Tennessee Constitution require a search warrant to particularly describe the place to

be searched. U.S. Const. amend. IV; Tenn. Const. art. I, § 7. "A search warrant can only be issued on probable cause, supported by affidavit, naming or describing the person, and particularly describing the property, and the place to be searched." T.C.A. § 40-6-103; *see also* Tenn. R. Crim. P. 41(c); (3)(A) ("[a] warrant shall issue only on an affidavit or affidavits that are sworn before the magistrate and establish the grounds for issuing the warrant" and the warrant must "identify the property or place to be searched" and "name or describe the property or person to be seized").

Unlike a warrantless search, a search conducted on the basis of probable cause and a warrant is presumptively reasonable. *State v. Hamm*, 589 S.W.3d 765, 771 (Tenn. 2019) (citing *State v. McCormick*, 494 S.W.3d 673, 678-79 (Tenn. 2016)). To pass constitutional muster, a search warrant must be issued by a neutral and detached magistrate only after submission of an affidavit setting forth substantial facts establishing probable cause. *State v. Tuttle*, 515 S.W.3d 282, 299 (Tenn. 2017) (citing *Illinois v. Gates*, 462 U.S. 213, 240 (1983)).

Probable cause exists if, under the totality of the circumstances set forth in the affidavit presented to the magistrate, there is a "fair probability" that contraband or evidence of a crime will be found in a particular place at the time the warrant is issued. *Tuttle*, 515 S.W.3d at 303-04 (quoting *Gates*, 462 U.S. at 238-39). "Probable cause is more than a mere suspicion but less than absolute certainty." *Id.* at 300 (quoting *State v. Reynolds*, 504 S.W.3d 283, 300 (Tenn. 2016)). Probable cause determinations are not technical, but instead, "are extremely fact-dependent." *Id.* at 300 (quoting *State v. Bell*, 429 S.W.3d 524, 534 (Tenn. 2014)). Indeed, the probabilities involved in making a probable cause determination concern "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Id.* at 300 (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)).

Our review of the issue of probable cause of a search warrant is confined to the four corners of the affidavit. *Keith*, 978 S.W.2d at 870. Thus, this court will not look to other evidence provided to or known by the issuing magistrate or possessed by the affiant. *State v. Moon*, 841 S.W.2d 336, 338 (Tenn. Crim. App. 1992). "[T]he duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed." *Tuttle*, 515 S.W.3d at 304 (quoting *Gates*, 462 U.S. at 238-39).

Furthermore, a defendant who seeks to suppress evidence seized pursuant to a search warrant has the burden of proving by a preponderance of the evidence (1) that the defendant had a legitimate expectation of privacy in the place or property from which the items sought to be suppressed were seized, (2) the identity of the items the defendant seeks to suppress, and (3) that the search conducted pursuant to the warrant was constitutionally infirm or violated statutory law. *Willis*, 496 S.W.3d at 719.

We begin our analysis with the presumption that the search of Defendant's blood was reasonable because it was seized pursuant to a warrant. *Hamm*, 589 S.W.3d at 771. And because the blood was seized pursuant to a warrant, Defendant bears the burden of proving by a preponderance of the evidence that the search was constitutionally infirm or violated statutory law. *Willis*, 496 S.W.3d at 719.

Looking at the four corners of the affidavit in this case, the trial court held that the warrant described more than a "mere" car accident, but provided circumstances to suggest that Defendant's ability to safely operate her vehicle was impaired:

> And I think what we've got to bear in mind in this case this was not a mere accident. If Trooper Priest had been called to investigate an accident that occurred at the intersection of Concord R[oa]d[] and Franklin Pike, between two vehicles and they're sitting there in the middle of the road, even though it's a horrible accident those facts may very well not support the issuance of a warrant.

> But this affidavit states that there are facts and circumstances which would cause a reasonable person to believe that impairment could have been involved in this crash looking at the totality and evaluating everything using a common sense standard. Those facts include in fact that one this accident occurred at 4:57 in the morning – 4:56 rather in the morning. [Defendant] was driving north on Franklin Road at a time when traffic would ordinarily be light, you wouldn't be in the middle of a heavy traffic pattern with somebody driving in a way that would cause you to lo[]se control of your vehicle or operate your vehicle outside the lane of travel to which you are assigned. She travel[ed] for more than a mile in the [south]bound lane on the wrong side of the road. She traveled without her lights on. It resulted in a head-on collision with a vehicle traveling in the southbound lane.

> Those facts then coupled with the experience of the officer which the Court has mentioned who is an experienced trooper, serving since 2013 and who has been trained in DUI investigations including ARIDE investigations in the Court's mind are sufficient in this case to support the affidavit that was issued and the warrant that was issued – the affidavit that was submitted and the warrant is issued based upon the affidavit. It's not a mere accident. This accident had unique features associated with it that would give a reasonable explanation based upon bad driving certainly, but also a reasonable, explanation based on impairment while driving.

So the Court finds in this case that the warrant was appropriately issued and that the Motion should be denied.

As the reviewing court, we afford "great deference" to the magistrate's determination that probable cause existed to issue the warrant for the blood draw. *Tuttle*, 515 S.W.3d at 300. Similarly, we will uphold the trial court's findings of fact if the evidence does not preponderate against them. *Martin*, 505 S.W.3d at 500; *Carter*, 16 S.W.3d at 765. Moreover, we will view the evidence at the suppression hearing in favor of the prevailing party. *Martin*, 505 S.W.3d at 500; *Carter*, 16 S.W.3d at 765.

When the totality of the circumstances detailed in the affidavit are viewed in a commonsense and practical manner, we conclude that the affidavit provided the magistrate with a substantial basis for determining that Defendant's blood would uncover evidence of vehicular homicide, vehicular assault, and driving under the influence involving a traffic crash with injury to another party. In reaching this conclusion, we reject Defendant's argument that the trial court's analysis and conclusion are "factually and legally flawed" because Trooper Priest did not include certain information in the affidavit such as the direction Defendant was driving at the time of the crash, the road she was traveling on leading to the crash, whether the victim's car was stationary or moving at the time of the crash, and whether traffic was light or heavy.

The direction of Defendant's vehicle, the position of the victim's vehicle, and the traffic density near and around Brentwood Market at the time of the crash was not necessary to establish probable cause where the affidavit stated that Defendant's vehicle was squarely in the wrong lane of traffic without activated headlights at 4:56 a.m. leading to the head-on collision with the victim. A commonsense approach of the totality of the circumstances suggested that Defendant was not able to safely operate her vehicle. "Under that commonsense approach, we can appropriately recognize certain driving behaviors as sound indicia of drunk driving." *Navarette v. California*, 572 U.S. 393, 402 (2014) (holding that a reliable tip alleging the dangerous behaviors would justify a traffic stop on suspicion of drunk driving); *State v. Van Camp*, No. E2014-00667-CCA-R3-CD, 2014 WL 7399671, at *5 (Tenn. Crim. App. Dec. 29, 2014) (holding that a car driving in the wrong lane or straddling two lanes was consistent with impaired driving to justify a traffic stop).

It was therefore reasonable for the magistrate to determine probable cause for the search warrant existed. Defendant complains that she was not identified in the affidavit as the driver of the vehicle going in the wrong direction. However, while she was referred to as "Defendant" in the statement of facts in support of probable cause, the affidavit identified her as the driver multiple times by her full name, race, gender, and date of birth. Thus, there was no confusion that the driver of the vehicle seen driving in the wrong lane of traffic without headlights was Defendant.

- 20 -

Defendant's chief contention is that probable cause to believe a person is driving under the influence of alcohol ordinarily requires more than the simple fact of a car accident, that it requires some standard indicia of intoxication such as slurred speech, glassy eyes, or an odor of alcohol. Defendant relies on *People v. Debruyne*, No. 346534, 2019 WL 3059769 (Mich. Ct. App. July 11, 2019); however, the facts of *Debruyne* are distinguishable from the facts of this case. In *Debruyne*, the defendant was involved in a motorcycle accident that killed his passenger. *Id.* at \*1. While the defendant was in the emergency room receiving treatment, the investigating officer obtained a search warrant for a blood draw. *Id.* Subsequent testing revealed that the defendant's BAC was over the legal limit. *Id.* The warrant stated simply that the defendant was seen driving in a "reckless manner" and "speeding" without any explanation as to how fast the defendant was driving, what made his driving reckless, how the motorcycle accident occurred, or why the circumstances suggested intoxication. *Id.* at \*1, 4. At the suppression hearing, the prosecutor attempted to rehabilitate the warrant by augmenting it with information that was "within the requesting officer's mind," but was not submitted to the judge in the affidavit. *Id.* at \*1-3. For instance, the prosecutor stated that the defendant was driving at a high rate of speed, tailgating the car in front of him, and swerving back and forth. *Id.* at \*1. The prosecutor added that a homeowner near the crash found "a bottle of Fireball" in his yard and that the defendant smelled of alcohol according to multiple first responders. *Id.* None of this information was in the affidavit. Accordingly, the court in *Debruyne* held, "The issuing judge could not reach an independent finding that probable cause existed based on the information provided and the resultant warrant was invalid." *Id.*

Unlike *Debruyne,* in this case, all the basic information about the crash was provided to the magistrate. While it was later determined that the distance Defendant was seen traveling in the wrong direction was less than the distance alleged in the affidavit, this discrepancy does not invalidate the warrant. There was no dispute that Defendant was driving in the wrong lane of traffic without activated headlights at 4:56 a.m. leading to the head-on collision with the victim. Those facts are sufficient to support a finding of probable cause.

As additional support for her argument that probable cause was lacking, Defendant contends the trial court "conceded" its prior decision to deny the motion to suppress when the trial court ruled that because Trooper Buchanan did not gain information about Defendant's intoxication from his reconstruction of the crash, he could not mention Defendant's BAC in his testimony about the cause of the crash. Again, we reiterate that our review in this instance is limited to the face of the affidavit. *Keith*, 978 S.W.2d at 870. Trooper Buchanan's conclusion based on his reconstruction of the crash has no bearing on whether Trooper Priest's affidavit established probable cause that Defendant's blood would uncover evidence of a crime. Nor does the trial court's decision on an evidentiary

issue at trial invalidate or undermine the trial court's earlier decision to deny Defendant's motion to suppress.

We conclude that the affidavit sufficiently established probable cause. Accordingly, the trial court properly denied Defendant's motion to suppress, and Defendant is not entitled to relief.

## II.        *Motion to Suppress Defendant's BAC Result – Scope of the Warrant*

In the second issue regarding her motion to suppress the BAC results, Defendant contends that based on a plain reading of the warrant, Trooper Priest was required to serve the warrant on Defendant and retrieve a blood sample directly from her and that by serving the warrant on the hospital and retrieving Defendant's sample from the hospital, Trooper Priest exceeded the scope of the warrant. The State contends Trooper Priest did not exceed the scope of the warrant because the magistrate authorized the seizure of "any blood" of Defendant which included blood previously drawn, collected, and stored in the regular course of treating patients in the emergency department. We agree with the State.

Again, because this issue arises from a motion to suppress, we review the trial court's ruling by affording the prevailing party the "strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." *Carter*, 16 S.W.3d at 765; *Martin*, 505 S.W.3d at 500; *Henry*, 539 S.W.3d at 232. We are bound by the trial court's factual findings unless the evidence preponderates against them. *Martin*, 505 S.W.3d at 500; *Keith*, 978 S.W.2d at 864; *Henry*, 539 S.W.3d at 232. However, the application of the law to the facts is a question of law and is reviewed de novo. *Clayton*, 535 S.W.3d at 846; *Willis*, 496 S.W.3d at 686; *Climer*, 400 S.W.3d at 556. When evaluating the trial court's ruling on a suppression motion, this court may consider the entire record, including evidence presented at trial. *Williamson*, 368 S.W.3d at 473. And because Defendant sought to suppress evidence seized pursuant to a search warrant, she carries the burden of proving by a preponderance of the evidence (1) that she had a legitimate expectation of privacy in the place or property from which the items sought to be suppressed were seized, (2) the identity of the items she sought to suppress, and (3) that the search conducted pursuant to the warrant was constitutionally infirm or violated statutory law. *Willis*, 496 S.W.3d at 719.

"A search warrant can only be issued on probable cause, supported by affidavit, naming or describing the person, and particularly describing the property, and the place to be searched." T.C.A. § 40-6-103. Requiring the property or premises to be particularly described in the search warrant serves two purposes. First, this requirement protects the accused from being subjected to an unreasonable search and seizure. *State v. Hinds*, No. No. E2022-00544-CCA-R3-CD, 2023 WL 5164634, at *19 (Tenn. Crim. App. Aug. 11,

2023), *perm. app. denied* (Tenn. Jan. 11, 2024) (citing *State v. Vanderford*, 980 S.W.2d 390, 404 (Tenn. Crim. App. 1997). Second, this requirement prevents the officer from searching the premises of one person under a warrant directed against those of another. *Id.*

"[T]he Fourth Amendment confines an officer executing a search warrant strictly within the bounds set by the warrant." *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 394 n.7 (1971); *see Dalia v. United States*, 441 U.S. 238, 260 (1979) (Brennan, J., concurring in part). The language of the search warrant must be strictly construed. *United States v. Wright*, 468 F.2d 1184, 1185 (6th Cir. 1972) (citation omitted); *see State v. Wilson*, No. 153, 1988 WL 42652, at *2 (Tenn. Crim. App. May 4, 1988). A search pursuant to a valid search warrant may evolve into an invalid search if the officers executing the search warrant flagrantly disregard the limitations of the search warrant. *United States v. Lambert*, 771 F.2d 83, 93 (6th Cir. 1985). An officer flagrantly disregards the limitations of a warrant only where he exceeds the scope of the warrant in the places searched. *Waller v. Georgia*, 467 U.S. 39, 43 n.3 (1984).

Here, the trial court held that Trooper Priest did not exceed the scope of the warrant by serving the warrant on VUMC:

First, the Court finds the search warrant is not a general warrant because the search warrant is specific as to what evidence is to be seized (evidence of vehicular homicide and vehicular assault) and where such evidence is located ("in the . . . blood of Ashley Bianc[a] Ruth Kroese"). Further, the search warrant particularly allows for seizure of "ANY blood from Ashley Bianc[a] Ruth Kroese." The plain definition of the term "any" in describing [Defendant]'s blood can be understood to encompass not only [Defendant]'s blood existing within her body at the time the warrant was executed, but also [Defendant]'s existing blood samples. The search warrant is specific and leaves no room for misinterpretation.

\*\*\*

The officers in this case did not flagrantly disregard the terms of the search warrant. The officers went to [VUMC], where [Defendant]'s body and blood were located, and retrieved her blood samples pursuant to a valid search warrant. The terms of the search warrant in this case are not ambiguous, and particularly describe the place to be searched and the property to be seized. There was only one Ashley Bianc[a] Ruth Kroese at Vanderbilt at the time the search warrant was executed. There was no confusion as to whose blood would be searched and seized. The search warrant did not authorize the

- 23 -

officers to retrieve blood belonging to a different individual named Ashley Bianc[a] Ruth Kroese.

We agree with the trial court that the execution of the search warrant for Defendant's blood was not constitutionally infirm.

In an attempt to have the results of her blood sample suppressed, Defendant cites *State v. Nunnery*, No. M2016-01932-CCA-R9-CD, 2017 WL 2985084 (Tenn. Crim. App. Jul. 13, 2017), where this court affirmed the trial court's granting of a motion to suppress the results of a blood draw based on the officer's failure to abide by the terms of the search warrant. In *Nunnery*, the search warrant commanded the executing officer to "take custody of the suspect and transport the suspect to a person qualified to draw blood in Lewis County." *Id.* at *6. The jurisdiction of the magistrate who signed the warrant was limited to Lewis County. *Id.* However, the defendant was transported to a medical facility in Perry County where the blood sample was procured because the nurse who drew the defendant's blood was qualified to draw blood in Perry County, but not Lewis County. *Id.* In finding the evidence suppressible, this court held that the officer's failure to abide by the jurisdictional limitations of the search warrant rendered the blood draw unconstitutional. *Id.* at *6-8.

Unlike *Nunnery*, in this case, there were no limitations in the warrant for searching and seizing Defendant's blood. The search warrant clearly stated that evidence of vehicular homicide and vehicular assault would be found "in the body and/or blood of" Defendant. The search warrant described the evidence to be seized as "ANY blood" from Defendant. *See Jones v. Kirchner*, 835 F.3d 74, 84-85 (D.C. Cir. 2016) (concluding that officers exceeded the authorization of the warrant by executing the search warrant at the defendant's home at 4:45 a.m. when the warrant expressly stated that a search was not to occur before 6:00 a.m.).

Defendant appears to argue that Trooper Priest could have amended the template he used for the warrant to explain that "ANY blood" from the body of Defendant included blood that was previously drawn during the normal course of treating trauma patients who enter the emergency department. In support of this assertion, Defendant called on Officer Breana Hosey of the Metropolitan Nashville Police Department. Because the trial court excluded Officer Hosey's trial testimony as irrelevant, the defense made an offer of proof of her testimony. However, Officer Hosey's excluded testimony could only be considered had Defendant challenged its exclusion, which she does not. Indeed, "the purpose of an offer of proof is to preserve excluded evidence in a manner sufficient to allow appellate review of the trial court's decision to exclude the evidence." *State v. Lowe*, 552 S.W.3d 842, 864 (Tenn. 2018). Therefore, we decline to consider Officer Hosey's testimony as supporting proof on any issue unrelated to its exclusion.

- 24 -

Finally, Defendant claims Trooper Priest exceeded the scope of the search warrant because the affidavit in an unrelated search warrant stated that Trooper Priest "obtain[ed] a blood sample from KROESE." On August 19, 2020, Brandon McCauley of the THP obtained a warrant to seize the data in Defendant's cell phone including "precision GPS location" and "Google searches" from the evening of June 17, 2020 to June 18, 2020, the morning of the crash. The execution of this warrant was not challenged and is not an issue on appeal. The search warrant of Defendant's Google search data is irrelevant to the execution of the search warrant for Defendant's blood.

We conclude that the trial court properly denied the motion to suppress evidence resulting from the blood draw and Defendant is not entitled to relief.

### III.     *Motion in Limine – Chain of Custody*

Defendant contends the trial court erred in denying her motion in limine to exclude her BAC result because the State failed to establish a proper chain of custody for the blood samples tested by the TBI. The State contends the trial court properly admitted evidence of the BAC test result because the chain of custody was established. We agree with the State.

Tennessee Rule of Evidence 901 requires authentication or identification of non-testimonial evidence entered at trial. Tenn. R. Evid. 901. It is "well-established that as a condition precedent to the introduction of tangible evidence, a witness must be able to identify the evidence or establish an unbroken chain of custody." *State v. Singh*, 684 S.W.3d 774, 783 (Tenn. Crim. App. 2023) (citing *State v. Scott*, 33 S.W.3d 746, 760 (Tenn. 2000)). The purpose of the rule is "to insure 'that there has been no tampering, loss, substitution, or mistake with respect to the evidence.'" *State v. Daniels*, 656 S.W.3d 378, 389-90 (Tenn. Crim. App. 2022) (quoting *Scott*, 33 S.W.3d at 760).

Each person who has custody or control of the evidence between the time it is obtained and the time it is introduced into evidence or subjected to scientific analysis is a "link" in the chain of custody. *State v. Cannon*, 254 S.W.3d 287, 296 (Tenn. 2008). As to the State's burden of proof, our supreme court has stated:

> Each link in the chain testifies about when, where, and how possession or control of the evidence was obtained; its condition upon receipt; where the item was kept; how it was safeguarded, if at all; any changes in its condition during possession; and when, where and how it left the witness's possession."

*Id.* (citations omitted).

However, it is not necessary that the State prove the identity of tangible evidence beyond all possibility of doubt. *Id.*; *State v. Holloman*, 835 S.W.2d 42, 46 (Tenn. Crim. App. 1992). Nor is the State required to establish facts which exclude every possibility of tampering. *Singh,* 684 S.W.3d at 783 (quoting *Cannon*, 254 S.W.3d at 296). Instead, the evidence may be admitted when the circumstances surrounding the evidence reasonably establish its identity and integrity. *Cannon*, 254 S.W.3d at 296; *Holloman*, 835 S.W.2d at 46. One manner of establishing the identity and integrity of evidence is through "the routine practice of an organization, whether corroborated or not and regardless of the presence of eye-witnesses[.]" Tenn. R. Evid. 406(a). Such proof is relevant to prove that the conduct of the organization on a particular occasion was in conformity with the habit or routine practice." *Id.* A trial court's finding that the State has established a sufficient chain of custody of a blood sample, or other tangible evidence, is reviewed for an abuse of discretion. *Singh*, 684 S.W.3d at 784 (citing *State v. Watkins*, 648 S.W.3d 235, 271 (Tenn. Crim. App. 2021)).

In denying Defendant's motion in limine, the trial court accredited the testimony of all the witnesses who testified regarding the chain of custody at the pretrial hearings: Allie Osborne, Defendant's primary care nurse who entered data from the EMS report into Defendant's medical record while Defendant's blood was being drawn; Elisa Grady, the VUMC lab program manager who turned over the tubes to Trooper Priest once she received approval from the VUMC's legal department; Trooper Priest, the officer who accepted the samples and immediately handed it to Trooper Nieuwenhuis; Trooper Nieuwenhuis, one of three officers who was at the crash site and who placed the sealed bag containing the blood samples in a TBI-issued blood kit and maintained custody of it while returning the warrant and transporting it to the TBI for testing; Leesa Gant, the TBI forensic technician who accepted the blood kit from Trooper Nieuwenhuis and deposited the kit in the toxicology vault; and Special Agent Ogilvie, the forensic scientist who retrieved the samples from the vault and tested it on the day the samples arrived at the TBI.

Defendant asserts that the State failed to establish proper chain of custody because no officer witnessed her blood being drawn and her blood was not collected and stored in the gray tubes contained in the TBI issued blood kit. Defendant further complains that the name and identity of the person who actually drew the blood was unknown. These claims are without merit. There was no testimony that Defendant's blood was contaminated during or after it was drawn, and there was nothing to suggest the bar code identification on Defendant's blood samples was altered at any point from the time it was gathered to the time its alcohol content was determined. Defendant raises issues related to the color of the stoppers on the tubes of blood. However, the proof shows that any "discrepancies" or differences Defendant references were simply a matter of opinion as to how the colors of

the stoppers on the tubes were described, not whether the blood was in fact Defendant's. Moreover, Agent Ogilvie testified that she performed the BAC test only on the blood in the tube with the lavender stopper. There was no evidence suggesting Defendant's blood was not collected, tested, and stored in conformance with VUMC's policies and procedures, or received and tested according to TBI's internal procedures for chain of custody.

Finally, in her reply brief, Defendant asserts that the trial court's decision was erroneous "in light of Agent Ogilvie's unchallenged testimony that all of the alcohol would have been eliminated by the time of the accident." Defendant appears to suggest that the blood drawn at VUMC was contaminated because based on Agent Ogilvie's response to a hypothetical question regarding the body's absorption and elimination of alcohol, her BAC should have been "zero." This portion of Agent Ogilvie's trial testimony went to the sufficiency of the evidence and has no bearing on the identity and integrity of the blood drawn at VUMC and tested by Agent Ogilvie at the TBI. By its verdict, the jury found that the Defendant had 0.08% or greater alcohol concentration in her blood at the time of the crash despite defense testimony that she appeared to be sober before she operated her vehicle.

After our thorough review of the record, we conclude that the trial court properly found that a proper chain of custody was established with respect to Defendant's blood samples. As this court has held, the State is not required to prove every link in the chain beyond all possibility of doubt. *Singh*; 684 S.W.3d at 783; *see State v. Braden*, 867 S.W.2d 750, 759 (Tenn. Crim. App. 1993) (holding evidence admissible where the lab form failed to indicate who drew the defendant's blood but testimony indicated that an omission on the form meant the blood was drawn by the doctor); *State v. Goad*, 692 S.W.2d 32, 36 (Tenn. Crim. App. 1985) (concluding that failure of the police property room custodian to testify did not interrupt chain of custody and render evidence inadmissible); *State v. Coury*, 697 S.W.2d 373, 378 (Tenn. Crim. App. 1984) (concluding defendant's clothing admissible even though testimony was unclear regarding which officer placed the evidence in the suitcase). Defendant is not entitled to relief.

*IV.     Sentencing – Especially Mitigated Offender Classification*

Defendant argues that the trial court erred in refusing to sentence Defendant as an especially mitigated offender and that its decision is not presumptively reasonable. The State argues that the trial court properly exercised its discretion in sentencing Defendant as a standard offender to avoid depreciating the seriousness of the offense. We agree with the State.

- 27 -

This court reviews a trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). This presumption applies to "within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *Id.* An appellate court has the authority to conduct de novo review but such review should be exercised sparingly. *Id.* at 705 n.41. "[I]f trial courts fail altogether to place on the record *any* reason for a particular sentence, the appellate courts would be forced to conduct a de novo review." *Id.* at 705 (emphasis added). The presumption of reasonableness leans heavily toward upholding a sentence where a trial court's findings are stated on the record regardless of the length or detail of those findings. "[W]hile a trial court's less comprehensive findings may require appellate courts to more carefully review the record, sentences should be upheld so long as the statutory purposes and principles, along with any applicable enhancement and mitigating factors, have been properly addressed." *Id.* at 706.

Especially mitigated offender status is reserved for "instances where the trial judge may desire to depart from even the minimum sentence for a Range I offender and impose lesser penalties." T.C.A. § 40-35-109, Advisory Comm'n Comments. Tennessee Code Annotated section 40-35-109 provides that a trial court "may find the defendant is an especially mitigated offender, if: (1) The defendant has no prior felony convictions; and (2) The court finds mitigating, but no enhancement factors." *Id.* § 40-35-109(a). "While the other types of offenders, such as multiple, persistent or career mandate sentences within their required ranges, a finding of an especially mitigated offender is discretionary with the trial court." *Id.* § 40-35-109, Advisory Comm'n Comments. "By using the permissive 'may' in Code section 40-35-109, the legislature clearly indicated that not every defendant so situated is entitled to be classified as an especially mitigated offender." *State v. Frye*, No. E2019-00686-CCA-R3-CD, 2021 WL 1971982, at *15 (Tenn. Crim. App. May 17, 2021) (citing *Braden*, 867 S.W.2d at 762).

Defendant asserts that caselaw on especially mitigating offenders is "confusing," and provides "no clear criteria" for the trial court in the exercise of its discretion. Yet, despite the alleged lack of guidance, she insists the trial court's reasons for declining to sentence her as an especially mitigated offender were not proper, and asks this court to remand with instructions to the trial court on how it should exercise its discretion or to classify her as an especially mitigated offender under de novo review. We disagree and decline Defendant's requests to revisit her sentence.

First, it would be contrary to established authority for this court to conduct de novo review where the trial court here made detailed and comprehensive findings on the record explaining its reasons for its sentencing decision. *Bise*, 380 S.W.3d at 705. Second, Defendant references cases that were decided before *Bise*. We do not find those cases confusing; rather, we find them distinctive from this case and therefore not relevant. In

each of the cases cited by Defendant, the underlying issue was whether the defendant met the statutory threshold requirement for especially mitigated offender status due to the presence of an enhancement factor or a prior conviction in the defendant's history. *State v. Blackstock*, 19 S.W.3d 200, 211-12 (Tenn. 2000) (reversing inter alia the judgment of this court affirming the trial court's refusal to sentence the defendant as an especially mitigated offender where no enhancement factors were proven to exist disqualifying the defendant under the statute); *State v. Carter*, No. 02C01-9710-CC-00421, 1998 WL 422267, at *2-3 (Tenn. Crim. App. July 28, 1998) (concluding that the trial court misapplied an enhancement factor but finding under de novo review the existence of another enhancement factor thereby affirming the trial court's denial of especially mitigated offender status along with the nature and circumstances of the convicted offense); *State v. Atkins*, No. 134, 1991 WL 114875, at *5 n.4 (Tenn. Crim. App. June 28, 1991) (reducing co-defendant's sentence under the especially mitigated status where the co-defendant's prior misdemeanor conviction was no longer a disqualifying factor under the statute as amended).

We find the decision of a far more recent case, *Frye*, 2021 WL 1971982, to mirror the circumstances of this case. In *Frye*, the defendant satisfied the statutory threshold requirements to be considered for especially mitigated offender classification with no prior convictions and no enhancement factors. *Id.* at *15. Because "nothing in the record suggest[ed] that the trial court abused its discretion by refusing to classify the defendant as an especially mitigated offender," this court affirmed the trial court's denial to declare her an especially mitigated offender as part of her Rule 35 motion to reduce her sentence. *Id.* at *14-15.

The trial court carefully considered all of the evidence, the statutory enhancement and mitigating factors, and the purposes and principles of sentencing before sentencing Defendant as a standard offender. The trial court acknowledged Defendant's lack of criminal history, recognized the support and favor of her friends and family, noted her exemplary educational record and vocational background, and found her expression of remorse to be genuine. However, due to the nature and circumstances of the case, the trial court sentenced Defendant as a standard offender. Nothing in this record suggests the trial court abused its discretion.

One of the foremost principles of sentencing is deterrence and the need to "avoid depreciating the seriousness of the offense." *See* T.C.A. § 40-35-102(3)(A) ("Punishment shall be imposed to prevent crime and promote respect for the law by: (A) Providing an effective general deterrent to those likely to violate the criminal laws of this state"); *see also id.* § 40-35-103(1)(B) ("Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses"). The trial court's reasons for its

sentencing decision are consistent with the principles of sentencing. Defendant has, therefore, failed to either establish an abuse of discretion or otherwise overcome the presumption that her eight-year sentence is reasonable. She is not entitled to relief.

## Conclusion

For the foregoing reasons, the judgments of the trial court are affirmed.

_____

JILL BARTEE AYERS, JUDGE